# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| TRACY R. TURNER, | ) |
| *Plaintiff,* | ) |
| -vs- | ) Case No. |
| | ) JURY DEMAND |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, | ) |
| *Defendant.* | ) |

## C O M P L A I N T

Speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection.

---*Snyder v. Phelps*, 131 S.Ct. 1207, 1211, 562 U.S. 443, 444 (U.S. 2011).

## I.
## Introduction

1. Tracy R. Turner brings this action against the Metropolitan Government of Nashville and Davidson County, Tennessee pursuant to 42 U.S.C. § 1983 for redress of wrongs committed by the Defendant, and for compensation for injuries arising out of the Defendant's intentional deprivation of his constitutionally protected rights under the First Amendment to the United States Constitution as well as its violation of his rights under corollary provisions of the Constitution of the State of Tennessee. Specifically, the Plaintiff sues the Defendant for its retaliation against him for the exercise of his freedom of political expression as a private citizen, for his political commentary on social media

about matters of inherent public concern, *i.e.* the Black Lives Matter organization, and the BLM and Antifa movement. In addition, the Defendant censored Plaintiff's speech activity by requiring him to remove all of his political posts.

2. The Defendant also violated its own internal policies by adopting an arbitrary and double standard, and by selectively enforcing its policies with regard to employee use of social media. The severity of the penalty imposed in this case – demotion -- was arbitrary and based on viewpoint discrimination.

3. Plaintiff seeks declaratory relief, nominal damages, compensatory damages and reasonable attorney's fees and costs as permitted by 42 U.S.C.§ 1988.

## II.
## Jurisdiction and Venue

4. Jurisdiction is vested in this Court to hear and decide all issues presented in this case pursuant to 28 U.S.C. § 1331, 1343 and 1367, this case being predicated on a federal question and the enforcement of certain federal constitutionally protected rights as guaranteed under the First Amendment of the United States constitution.

5. The Court has the authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 and 2202.

6. Venue is proper in this Court under 28 U.S.C.§ 1491(b), as the Plaintiff and the Defendant reside or are situated within this federal district and the Defendant's wrongful conduct took place within this federal district.

## III.
## Parties

### *Plaintiff*

7. Tracy R. Turner is an adult citizen and resident of Old Hickory, Davidson County, Tennessee, and is an employee of the government of the Metropolitan Government of Nashville and Davidson County, Tennessee.

### *Defendant*

8. The Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro" or in the alternative "Metro Government") is a local body politic and municipality and exists under and by virtue of the laws of the State of Tennessee.

## IV.
## Facts

9. Tracy Turner was employed by Metro as a firefighter for the Nashville Fire Department ("NFD") for twenty five (25) years. Until the events occurred that gave rise to this complaint, he served as a Captain for the NFD.

10. Throughout his employment, Mr. Turner consistently scored acceptable or "commendable" ratings on all of his employee evaluations by his superiors. Prior to his demotion and the events that gave rise to this Complaint, he had never been subjected to any disciplinary action of any type.

### **Events of 2020**

11. 2020 was among the most eventful years in United States history.

12. The year began with the impeachment trial in the United States Senate of President Donald J. Trump.

13. After the acquittal of President Trump, national attention soon shifted to the global Covid-19 pandemic.

14. The pandemic has prompted the global shutdown of schools, businesses, sporting events, religious gatherings and most forms of entertainment on an unprecedented scale. It has prompted mask mandates throughout the country ordered on both state and local levels.

15. In addition to pandemic-related tensions, there is quite evidently a sharp partisan divide in the United States.

16. Many national commentators and observers of American culture have publicly opined that the United States is undergoing changes that are reshaping the country in profound ways.

17. On May 25, 2020, in the midst of these national tensions, George Floyd, an African American man, was killed in Minneapolis by a Minneapolis police offer who knelt on his neck for nearly eight minutes, ignoring Floyd's statements that he could not breathe.

18. Bystanders who witnessed the arrest of George Floyd captured the event on video and released the footage on May 26, 2020.

19. The death of George Floyd sparked nationwide protests regarding perceptions of racial injustice in the United States in general and targeted criticism of law enforcement in particular.

20. While several protests began peacefully, they quickly escalated into riots, looting and violence.

21. Popular response to the orchestrated violence and rioting in cities across the United States served only to deepen divisions in the United States, especially with regard to claims of racial injustice.

22. One organization that played a prominent role in the protests is Black Lives Matter ("BLM").

23. BLM was formed in 2013 following the controversial acquittal of George Zimmerman in connection with the death of Trayvon Martin, an African American teenager.

24. BLM's self-described mission is "to eradicate white supremacy and build local power to intervene in violence inflicted on Black communities by the state and vigilantes." [1]

25. BLM describes its beliefs, in part, as follows: [2]

   a. "Build[ing] local power" and "interven[ing] when violence [is] inflicted on Black communities by the state and vigilantes";

   b. "Struggling together," "imagining and creating a world free of anti-Blackness, where every black person has the social, economic, and political power to thrive";

   c. We disrupt the Western-prescribed nuclear family structure requirement by supporting each other as extended families and "villages" that collectively care for one another, especially our children, to the degree that mothers, parents, and children are comfortable."

---

[1] https://blacklivesmatter.com/what-we-believe/
[2] https://blacklivesmatter.com/what-we-believe/

5

26. In addition to these views, BLM advocates for defunding the police, as illustrated by the following statement: "We know that police don't keep us safe – and as long as we continue to pump money into our corrupt criminal justice system at the expense of housing, health, and education investments – we will never be truly safe."[3]

27. One of the more controversial positions that BLM takes is that "white supremacy" is a widespread, institutional problem in the United States

### Exercising Political Speech within this Cultural Milieu

28. It is within this cultural milieu that Mr. Turner chose to exercise one of the most coveted constitutional rights guaranteed by the United States and the Tennessee Constitutions: the right to free speech.

29. In particular, on several separate occasions Mr. Turner chose to speak his personal views <u>as a private citizen</u> on a forum that has become, for all intents and purposes, the modern public square: Facebook. Mr. Turner expressed his personal political thoughts regarding the racial division in our country. One such post contained a link to a July 15, 2020 news article in The Patriot Post entitled: "BLM's Roots Are Tied To Racists." The article, a copy of which is attached hereto as Exhibit A, discusses the BLM movement's documented ties to Marxist ideology.

30. Mr. Turner's intended purpose in making these posts were to express his personal views as a citizen and to expound upon a commonly-held view among many people of good conscience that the organization Black Lives Matter is political in nature.

---

[3] https://blacklivesmatter.com

31. Racial division in the United States is a matter of inherent public interest.

32. Political division in the United States is a matter of inherent public interest.

33. When Mr. Turner posted his remarks on his personal Facebook he was speaking as a private citizen on matters of public concern and not as an employee about matters of personal interest.

34. Mr. Turner's private and political Facebook posts were not directed at the Metropolitan Government of Nashville and Davidson County, Tennessee.

35. Mr. Turner's private and political Facebook posts commented on matters of inherent public opinion.

36. Mr. Turner's Facebook posts were not directed at or threatening or harassing of any employee of the Metropolitan Government of Nashville and Davidson County, Tennessee.

37. Mr. Turner's private and political Facebook posts did not express any grievance related to departmental policies or fellow workers within his department.

38. Mr. Turner's private and political Facebook posts did not result in any material disruption of the workplace or interfere with the ability of the Defendant to carry out its mission or goals.

39. On July 22, 2020, his day off, Mr. Turner received a call from Chief Jerry Tomilson. Chief Tomilson instructed Mr. Turner to immediately remove his post of an article entitled <u>BLM's Roots are Tied to Racists</u>, from www.patriotpost.us . (A copy of this article is attached hereto as Exhibit A).

40. Mr. Turner told Chief Tomilson that he would remove the article; but inquired as to what the issue was regarding the news article. Chief Tomilson simply exclaimed, "Just take the post down!"

41. The news article that Mr. Turner was ordered to remove was published by an independent news media organization called the <u>Patriot Post</u>, which publishes a weekday report of news and current events. The article in question was authored by a news analyst for the Patriot Post named Thomas Gallatin and quotes two of the original founders of the Black Lives Matter movement affirming BLM's ties to Marxist ideology.

### July 23, 2020 Meeting

42. Later, on July 22, 2020, Mr. Turner received a phone call from Chief Tim Moyers. Chief Moyers stated: "I don't know what this is about, but you are to report to the 'Gold Room' [Headquarters] at 8:00 a.m. tomorrow morning."

43. On July 23, 2020, when he arrived at the "Gold Room" as instructed, Mr. Turner was greeted by Chief Tomlinson, Chief Moyers, Union President Mark Young, and Public Information Officer Joseph Pleasant.

44. Chief Tomlinson asked Mr. Turner if he knew why he was asked to come downtown. When Mr. Turner responded that he did not, Chief Tomlinson told Mr. Turner that it was about his Facebook posts (*plural*). Mr. Turner inquired to which posts he was referring, but Chief Tomlinson did not respond. Instead, at this point, Public Information Officer Joseph Pleasant took over the meeting.

45. Mr. Pleasant claimed that *all* of Mr. Turner's posts had racial overtones. He laid out several photocopies of Mr. Turner's Facebook posts. Mr. Pleasant claimed that Mr. Turner had offended someone in the African American Community.

46. Mr. Pleasant then launched into a baseless attack upon Mr. Turner's character and fitness as a fireman, stating: "Honestly, I don't think you should be a fireman and a first responder in an African American, a predominately African American, community. I just don't believe that, because I don't believe that you are giving us 100% effort every time you go out on a call and – when you see a Black person that's in need – that you give a 100% effort in order to save this person."

47. Mr. Turner asked Mr. Pleasant to identify which of his Facebook posts had offended anyone. Rather than respond to his question, Mr. Pleasant simply replied that all of his Facebook posts were offensive to him and had racist implications.

48. Mr. Turner was never advised by anyone which posts in particular were offensive or violated any NFD or Metro policy.

49. At one point during the meeting, Mr. Turner turned to Chief Tomlinson and asked, "Jerry, we have worked in the most dangerous and poorest areas in downtown and East Nashville for twenty years together. Have you ever seen me treat anyone, patient or fellow firefighter differently?" To which, Chief Tomlinson, said nothing.

50. On August 10, 2020, Mr. Turner attended a disciplinary hearing. In attendance were Jamie Sommers, the head of Human Resources; Chief Chris Downing; the Assistant Chief; EMS Chief Kapoo; and Mark Young, the Union President.

9

Case 3:21-cv-00042   Document 1   Filed 01/19/21   Page 9 of 15 PageID #: 20

51. Prior to the start of the hearing, Mr. Turner received a text from Steven Robinson, an African-American colleague of twenty-two years. Mr. Robinson sent a very specific note refuting the charges of racism as ridiculous. This text was read into the record.

52. Mr. Turner was represented at this hearing by Mark Young, who began his presentation by displaying several posts by other fireman which contained egregious racial slurs, derogatory statements about abusing women, and slurs against gays.

53. Mr. Young also showed the panel a Facebook post by a fellow Nashville Fireman and the son of the Assistant Chief, stating: "*All your white daughters love every inch of BLM.*" The Assistant Chief recognized this as one authored by his son.

54. Following a brief panel discussion, the head of Human Resources then announced: "the issue of race off the table". Mr. Young then asked, on Mr. Turner's behalf, "Then, why are we here?"

55. Mr. Sommers replied, "Mr. Turner is being punished for Facebook violations. His account was set to public and not private, and he did not utilize a disclaimer." He said that Mr. Turner's posts had "made the NFD look bad". Referring to Mr. Turner, Mr. Sommers then stated: "We (referring to the NFD) had an itch, and we just scratched it!"

56. Mr. Young asked the panel why the firemen that posted other offensive Facebook posts had not been called in for discipline or instructed to remove their various posts, and were never punished. He also asked the panel why Mr. Turner was being punished for his posts.

57. Mr. Sommers replied because the Plaintiff was a Captain.

58. Chief Swan demoted Mr. Turner for six (6) months to the lowest position one may hold in the Department, and also barred him from bidding on a new territory for two (2) years. In addition, Mr. Turner was ordered to attend a series of diversity and sensitivity classes.

59. When Mr. Young inquired which post specifically resulted in such a harsh punishment, Chief Swan became annoyed and proceeded to rant about the optics of Mr. Turner's posts regarding BLM and masks (referring apparently to some of the Plaintiff's posts concerning the COVID-19 mask mandate).

60. Unbeknownst to Mr. Turner, on the date of the August 10, 2020 disciplinary meeting, Joseph Pleasant sent out a blast email to everyone in the Nashville Fire Department, as well as to the local media, attaching a News Release signed by Chief Swann that announced Mr. Turner's demotion and the department's determination that he needed "sensitivity training". (A true and correct copy of this News Release is attached hereto as Exhibit B and is incorporated herein by reference).

61. The Defendant's News Release deliberately and falsely implied that Mr. Turner had made racist posts and was being punished accordingly. The purpose of this News Release was to publicly embarrass and humiliate the Plaintiff to his peers and to the world. This was the first time within the NFD that the Department issued a public announcement and press release announcing the punishment given to a serving Captain on the NFD.

62. Plaintiff alleges that Mr. Pleasant sent this blast email to the entire department and to outside media in retaliation against Mr. Turner for his Facebook post and for the

Plaintiff's expressed disagreement with Mr. Pleasant's request to have Nashville firefighters wear and sell, rainbow t-shirts, while on duty, at local gay bars.

63. As a result of the NFD's publicization of its disciplinary actions against Mr. Turner, he was sharply criticized in political circles outside the NFD.

64. On August 10, 2020, Mr. Turner was notified by a letter from Chief Swan that he had been found guilty of violating the following disciplinary rules.

> **Section 6.7 of the Metro Civil Service Rules**
>
> Sub-section 32. Any failure of good behavior which reflects discredit upon himself, the department and/or the Metropolitan Government.
>
> Sub-section 33. Conduct unbecoming an employee of the Metropolitan Government.
>
> **OPG 11.02.      Social Media Policy –Employee Personal Use of Social Media:**
>
> a) In general, Nashville Fire Department employees who participate in social media are free to publish their own personal information. Employees who identify themselves or who are identified (through photos or other means) as Nashville Fire Department employees while using social media must state in clear terms that their expressed views are theirs alone and do not reflect the views of the Nashville Fire Department. Except as authorized, all employees are prohibited from representing the Nashville Fire Department through their personal use of social media.
>
> \*\*\*
>
> c) With respect to online behavior, employees are personally responsible for their activities conducted with a Metro Nashville Fire Department e-mail address, and/or which can be traced back to a Metro Nashville Fire Department e-mail address. Employees are personally responsible for their activities on social media and are responsible for any content they publish online. As such, employees may not post

material that is defamatory, threatening, obscene, harassing, or that violates the privacy rights of any individual or entity.

    d) Employees are expected to refrain from social media and online activities that reflect poorly on the Nashville Fire Department. Inappropriate social media and online activities that reflect poorly upon the Nashville Fire Department, its employees, or services, may result in corrective and/or disciplinary action.

## VI.
## Causes of Action

### COUNT I

### 42 U.S.C. § 1983
### Violation of First Amendment of United States Constitution

65. Plaintiff incorporates by reference herein as fully as though set forth verbatim the allegations set forth in the preceding numbered paragraphs and does further allege as follows.

66. The Defendant's decision to demote the Plaintiff's employment was retaliatory in nature and based, in whole or in part, on his personal exercise of his protected free speech activity on matters of inherent public concern.

67. The Defendant's requirement that Plaintiff remove his Facebook post containing a news article regarding the ideological ties between the Black Lives Matters movement and Marxism, constitutes viewpoint discrimination and impermissible governmental censorship of protected free speech activity.

68. The Defendant's actions, as set forth herein, served to deprive the Plaintiff of, and to infringe upon, his protected rights of freedom of expression as guaranteed by the First Amendment of the United States Constitution.

69. As a proximate result of the Defendant's actions, the Plaintiff has suffered, and continues to suffer, economic and pecuniary damages in the form of loss of earnings. In addition, the Plaintiff has suffered mental anguish, humiliation, embarrassment and emotional injury for which he is entitled to an award of compensatory damages.

## Request for Relief

### *Declaratory Judgment*

1. An actual controversy exists between the parties as to whether the Defendant's policies, practices and customs with regard to the restrictions placed its employee's free speech activity as expressed on the employee's personal social media are enforced in an arbitrary manner and therefore violate the employee's constitutional rights. Plaintiff respectfully requests a declaratory judgment that the actions of the Metropolitan Government of Nashville and Davidson County, Tennessee violated the federal and state constitutional rights of the Plaintiff.

### *Nominal Damages*

2. Plaintiff seeks an order awarding nominal damages for the Defendant's violation of his federal and state constitutional rights.

### *Compensatory Damages*

3. Plaintiff seeks an order awarding compensatory damages for the Defendant's violation of his federal and state constitutional rights in the amount of $2,000,000.

### *Attorney's Fees and Costs*

4. Plaintiff seeks an order awarding the costs of this cause, including attorney's fees, costs and expenses under 42 U.S.C. § 1988.

### *Jury Demand*

5. Plaintiff demands a jury of six to hear and try this case.

### *Other Relief*

6. Plaintiff additionally requests such other relief as the Court deems just and proper.

Respectfully submitted,

 CRAIN LAW GROUP, PLLC

*/s Larry L. Crain*
Larry L. Crain
Tn. Supr. Crt. No. 9040
5214 Maryland Way
Suite 402
Brentwood, TN 37027
Tel. 615-376-2600
Fax. 615-345-6009
Larry@crainlaw.legal

*Counsel for the Plaintiff*